Burke, J.
The basic question presented is the sufficiency of the evidence supporting an indictment returned by the Kings County Grand Jury charging the defendant with the crime of manslaughter, second degree. He is accused of throwing his infant son into a baby carriage while in the heat of passion, thereby inflicting fatal injuries. The defendant’s motions to dismiss the indictment before trial following the inspection of the Grand Jury minutes and to dismiss the indictment at the trial for the failure of the prosecution to prove a prima facie case were denied.
The degree of evidence sufficient to warrant the return of an indictment by a Grand Jury is defined in the statute as the condition “ when all the evidence before them, taken together, is such as in their judgment would, if unexplained or uncontradicted, warrant a conviction by the trial jury”. (Code Grim. Pro., § 251.)
In the clearest of terms the statute states that the determination as to whether a trial jury would convict upon the evidence is specifically relegated by the Legislature to the judgment of the Grand Jury (People v. Eckert, 2 N Y 2d 126, 129). In order to form such a judgment, however, the evidence presented to the Grand Jury taken together must be the equivalent of prima facie proof that the crime charged has been committed by the defendant (People v. Silinsky, 235 App. Div. 289, 293). If the legal evidence does not establish the commission of the crime, it would be manifestly impossible for a Grand Jury to arrive at a judgment that a trial jury might convict.
A homicide is manslaughter in the second degree 1 ‘ when committed without a design to effect death * * * [i]n the *150 heat of passion, but not by a dangerous weapon or by the use of means either cruel or unusual ” (Penal Law, § 1052, subd. 2).
The minutes of the Grand Jury contain the following pertinent testimony. The Acting Medical Examiner of Kings County read from the medical report of the autopsy which revealed the cause of death. According to the medical report, it was due to a fractured skull, subdural and subarachoid hemorrhage. A stenographer from the District Attorney’s office identified statements recorded by him which had been made by the defendant to an Assistant District Attorney. The detective who arrested the defendant testified that he was present at the interview conducted by the Assistant District Attorney. He said that the defendant stated that upon entering his home on the evening of June 3,1956, between 8:00 and 8:30 p.m., he was greeted by his wife in a costume which he criticized. He admitted that he was annoyed because he had on prior occasions advised her that he expected his wife to be tidy. On this occasion his wife was sitting in the living room holding the infant in her arms, while their daughter, then aged 17 months, played on the floor beside her. After a brief discussion defendant took the infant and dropped him in his carriage which was standing nearby in the kitchen. When the defendant returned to the kitchen later, the baby was gasping for breath. Following fruitless efforts to resuscitate the baby, defendant called a priest, who in turn notified the fire department. The firemen administered oxygen in vain.
The sworn testimony of the defendant’s wife before the Grand Jury presents the events leading up to the child’s death in this manner. She said her husband carried the child into the kitchen. She was with him and watched.him “ lay the baby in the carriage # * * just like he always do ”. When Mrs. Peetz, Jr., was asked whether she and defendant had an argument, she replied “ No, we had a little discussion about how I was dressed ”. She explained that her husband expected her to be attractive when he arrived home, but that on the day of the tragedy she appeared dishevelled.
The Assistant District Attorney, dissatisfied with Mrs. Peetz, Jr.’s, replies, then endeavored to persuade her to admit that she had given different answers to questions put to her on a prior date. Mrs. Peetz, Jr., was asked many questions from a *151 ‘ ‘ transcript ’ ’ of the alleged prior interrogation of her concerning the state of mind of the defendant and the manner in which he carried and placed the baby in the carriage. She disavowed the answers read to her from the alleged statement taken at the time of the death of the baby. She flatly denied the suggestion that she had indicated that the defendant threatened her and the baby.
The statement allegedly given by Mrs. Peetz, Jr., was unsigned and unsworn. No identification of it was offered. No evidence was given concerning the taking of the statement even though the stenographer who was supposed to have recorded the discussion was a witness before the Grand Jury. The People now concede that the prior, unsworn statements attributed to Mrs. Peetz, Jr., are not legal evidence and should not have been considered by the Grand Jury (People v. Ferraro, 293 N. Y. 51; Matter of Roge v. Valentine, 280 N. Y. 268).
With the disowned statements excluded, the cumulative probative value of the legal evidence lacks that qualitative and quantitative weight and substance essential to support an indictment for manslaughter committed in the heat of passion.
The physical facts of the baby’s death cast no light on the state of mind of defendant. The medical testimony given before the Grand Jury and that given before the trial jury contained conflicting theories in regard to the cause of the injuries to the skull of the infant. At the trial they were regarded as the effect of several blows struck before the baby was placed in the carriage while before the Grand Jury they were thought of as caused by the fall into the carriage. Either version of the reason for the injuries could be correct. But the conclusion that either act was perpetrated in the heat of passion is the product of suspicion or surmise, not proof.
The act of dropping a baby into a carriage cannot be equated with a loss of reason as the result of an overpowering emotion such as rage or passion. Nor can we accept the bare statements that defendant was “ annoyed ” or that he and his wife had a 1 ‘ discussion ” as a sufficient basis upon which an inference of heat of passion can rest. Heat of passion refers to a state of mind where overpowering emotions have obscured reason, producing impulsive actions as distinguished from voluntary conduct (People v. Nicoll, 3 A D 2d 64).
*152 Doubtless there are many occasions when heat of passion is displayed by signs of rage or outward show of violence but, primarily being a state of mind, the existence of uncontrollable passion most often rests upon inferences (see People v. Lewis, 282 App. Div. 267, 269-270). Unless meanings of words are to be disregarded, the terms “annoyed” and “discussion” do not impart a sense of sudden or spontaneous action flowing from an overpowering emotion. If the defendant’s wife was an unreliable witness, acceptance of this fact would not supply the element necessary to establish the commission of the crime of manslaughter, second degree — the finding of heat of passion.
Since we find the indictment defective, it must be dismissed, and the fact that the evidence developed upon the trial may have been sufficient to justify a conviction cannot change that result (People v. Nitzberg, 289 N. Y. 523, 530).
The judgment of conviction should be reversed and the indictment dismissed.
Judges Desmond, Fuld, Froessel and Van Voorhis concur with Judge Burke; Chief Judge Conway concurs in the result upon the ground that the legal evidence before the Grand Jury was insufficient to warrant the inference that defendant’s actions were performed in the heat of passion and, thus, were insufficient to support an indictment charging defendant with the crime of manslaughter in the second degree; Judge Dye dissents and votes to affirm.
Judgment reversed, etc.