THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v WARNER-LAMBERT COMPANY, Doing Business Under the Name of WARNER-LAMBERT CO., AMERICAN CHICLE DIVISION, ARTHUR KRAFT, ED HARRIS, JAMES O'MAHONEY and JOHN O'ROURKE, Respondents.

Second Department, July 9, 1979

### APPEARANCES OF COUNSEL

*John J. Santucci, District Attorney (Thomas A. Demakos* and *Charles N. Walsh* of counsel), for appellant.

*Mudge Rose Guthrie & Alexander (John P. Hederman, Leonard Garment, William P. Laino* and *William J. Brennan* of counsel), and *Schulte & McGoldrick (Robert Kasanof* of counsel), for Warner-Lambert Company, respondent.

*Andrew M. Lawler, Jr. (Dennis E. Milton* of counsel), for James O'Mahoney and another, respondents.

*Arkin & Arisohn, P. C. (Stanley S. Arkin, Mark S. Arisohn* and *Arthur T. Cambouris* of counsel), for Arthur Kraft and another, respondents.

### OPINION OF THE COURT

*Per Curiam.*

This is an appeal by the People (1) from an order of the Supreme Court, Queens County, dated February 15, 1978, which granted the defendants' omnibus motion, *inter alia,* to inspect the Grand Jury minutes and, upon inspection, dismissed the indictment against them, and (2) from so much of a further order of the same court, dated July 26, 1978, as upon reargument, adhered to its original determination.

The question presented on this appeal is whether the evidence before the Grand Jury was legally sufficient to warrant the indictment of each of the defendants on six counts of manslaughter in the second degree and six counts of criminally negligent homicide.

■ Criminal Term held that the evidence was not sufficient and dismissed the indictment. Because we conclude that the evidence is sufficient, we reverse and direct that the indictment be reinstated.

### FACTUAL BACKGROUND

The corporate defendant, Warner-Lambert Company (Warner-Lambert), maintains a plant at 30-30 Thompson Avenue in Long Island City, Queens. At that facility several products, including Freshen-Up chewing gum (Freshen-Up), are manufactured. The defendant Arthur Kraft (Kraft) is Warner-Lambert's vice-president in charge of manufacturing. Defendant Ed Harris (Harris) is the director of corporate safety and security for Warner-Lambert. Both Kraft and Harris have their offices at Warner-Lambert's corporate headquarters in Morris Plains, New Jersey. James O'Mahoney (O'Mahoney) is the plant manager of the manufacturing facility in Long Island City, and John O'Rourke (O'Rourke) is its plant engineer.

On November 21, 1976 Freshen-Up was being manufactured on the fourth floor of the Long Island City plant. On that date an explosion occurred which resulted in the death of six employees and injury to numerous others. The indictment stems from these six deaths.

In 1974 a pilot project for the manufacture of Freshen-Up was begun by the corporate defendant using machines known as uniplast tabletting machines. At first a single machine, located on the first floor of the plant, was used. Eventually six machines (designated A, B, C, D, E and F) were put into operation on the fourth floor of the Long Island City plant. The machines were operated 24 hours a day (in three eight-hour shifts), six days a week. The only time during the work week that a particular machine would not be in operation was when it was being cleaned or if it had broken down.

In the actual manufacturing process, a slab of gum is produced by a "gum-mixing" machine, after which a section of the slab is passed along to a "hopper" which forms a hollow center in the "rope" of gum. The hollow center is then filled with a jelly-like substance. The rope is next fed into a bed filled with magnesium stearate (MS), a dry lubricant, which is applied by hand to prevent the finished pieces of gum from adhering either to themselves or the machinery. The uniplast

machines have die-cut punches which form the gum into square tablets, encasing the jelly center. Liquid nitrogen is used as a cryogenic or cooling agent to prevent the gum from sticking to the punches of the uniplast machines.

It is undisputed that the use of magnesium stearate created a "dust condition" on the fourth floor of the corporate defendant's plant. Some of the MS tended to accumulate at the base of the machines and on the overhead pipes (thus becoming inert), but the remainder of the dust remained ambient, that is, dispensed throughout the atmosphere in the area. In bulk or settled form, MS does not create a risk of explosion, and if ignited, will either smolder or burn. If MS is airborne at or above a certain concentration, however, it creates a serious risk of explosion if ignited. The point at which an explosion can occur is known as the "lower explosion level" (LEL).

Liquid nitrogen, which was also used in the manufacturing process, is nontoxic, noncombustible, and vaporizes quickly at room temperature. Normally, its usage is not considered hazardous.

It appears without contradiction that ambient MS dust will not explode unless an external source of ignition (e.g., a spark or a lighted match) is supplied. However, it also appears that a dust-type explosion can be precipitated by a cryogenic phenomenon known as "liquefaction", which occurs when highly volatile liquid oxygen is formed as a result of the condensation of air due to its exposure to a source of intense cold, for example, liquid nitrogen. The liquid oxygen can then collect, and if subjected to ignition, will explode. Moreover, because of its own volatile properties, the liquid oxygen will detonate easily, e.g., as the result of sharp impact. This primary explosion could, in turn, supply the ignition which could set off a secondary explosion of sufficiently concentrated MS dust.

### THE EVIDENCE BEFORE THE GRAND JURY

The uniplast machines used by Warner-Lambert at its Long Island City plant were sold to it by the Robert Bosch Packaging Corporation, which designed the machines for the manufacture of hard candy rather than gum. The seller's representative testified before the Grand Jury that the machines were not suitable for operation at very low temperatures and that when put to normal use they would operate at between 150 degrees and 160 degrees Fahrenheit. Other testimony indicated that the temperature of the liquid nitrogen inside the

"D" machine (the situs of the explosion) was *minus* 320 degrees Fahrenheit, cold enough, incidentally, for liquefaction to occur. In addition, the Bosch representative stated that the machines were not designed for use in conjunction with either liquid nitrogen or magnesium stearate, and that the manufacturer had not modified the machines to accommodate those substances. The motors of the uniplast machines were described as not being "dust proof", but were capable of such modification had the user so desired.

The plant's chief electrician testified that he had observed the use of MS in the pilot Freshen-Up project, and had specifically asked defendant O'Rourke if the machines and the wiring in the Freshen-Up department should be dust-proofed. O'Rourke allegedly answered in the negative.[1]

On the day before the explosion one of the employees who worked in the area noticed that the "D" machine was smoking or burning, but was told by his foreman not to worry about its condition. Other evidence indicating that the "D" machine was not operating normally included the following: the floor on which that machine was resting was some 12 inches thick, and yet the paint on the ceiling below that spot was peeling. This peeling was attributed to the fact that the "D" machine was operating at a colder temperature than the others.

Immediately prior to the explosion only the "D" machine was operating and certain of defendants' employees were involved in clearing away the settled MS dust by the use of push brooms and airhoses. The use of airhoses to clear away the magnesium stearate had the effect of blowing the settled dust back into the air, thus increasing the ambient concentration.

An expert in cryogenics confirmed the fact that the "peeling paint" was due to the "D" machine having gotten excessively cold from the use of liquid nitrogen, and stated that his postexplosion examination of that machine revealed that its cast iron base had become fractured, possibly as a result of the extreme cold. Once liquefaction has occurred, it was his opinion that a breakage of metal in the area of the base could provide a sufficient impact to cause an explosion.

As for the quantity of ambient MS dust, there was evidence

---

1. There was also testimony by an employee of the United States Occupational Safety and Health Administration that the electrical equipment and wiring in the Freshen-Up department were in violation of the requirements of the national electrical code for areas employing magnesium stearate.

that the foregoing was at or above the lower explosion level during normal operating conditions, and that an inspection by Warner-Lambert's insurer in February of 1976 (during which the inspector met with O'Rourke and representatives of Harris' office) resulted in written recommendations designed to reduce the ambient MS hazard. Among the recommendations were the following: (1) installation of a central vacuuming system for continuous dust collection; (2) a "housekeeping" program to try to reduce the level of ambient dust; (3) upgrading the electrical equipment so that it would be suitable for use in a dusty atmosphere; and (4) some form of "explosion venting" to relieve pressure in the event of an explosion. A formal report prepared on the basis of this inspection was mailed to Harris in May of 1976 and a letter accompanying that report specifically stated that there was *a hazard of an explosion due to the level of MS dust.* A second letter sent to Harris in June of 1976 reiterated the risk of an explosion, but in a corporate memorandum forwarded to O'Rourke and O'Mahoney after receipt of this report, it is stated that O'Rourke had outlined revisions which would negate the need for the recommended improvements. The propriety of this conclusion is open to serious question.

Also in June of 1976, the plant's operations manager sent a memorandum to O'Mahoney discussing the problem of dust control and concluding that the use of magnesium stearate should be eliminated.[2] Warner-Lambert did not act upon this memorandum, although a "coarser" form of magnesium stearate was apparently substituted in an attempt to alleviate the situation.

Subsequently, in July of 1976, a meeting was held to discuss the need for an exhaust system to eliminate the problem of ambient MS dust, and Kraft and O'Mahoney were in attendance. As a result of this meeting the idea was rejected. Kraft, it was established, had observed the Freshen-Up operation and was aware of the problem with MS dust, as was codefendant O'Mahoney. In addition, the projection engineer for the Freshen-Up department had worked out a dust collection system and submitted his recommendations and cost estimates to Kraft for approval. This proposal was also rejected.

---

2. Other testimony indicated that the use of magnesium stearate had been eliminated at one of the uniplast machines (the "A" machine) at a cost of $40,000, but that the remaining machines had not been converted. It also appears that MS is *not* employed in the manufacture of Freshen-Up gum at another of the corporate defendant's plants.

During August of 1976, it appears that the quantity of MS in use at the plant was reduced, and that the plant itself was closed for a period of thorough cleaning. Employees testified, however, that within two to three weeks after the cleanup the condition had worsened and that the ambient MS dust was often as thick as a fog.

In September of 1976 an engineering consultant for Warner-Lambert's insurer was sent to the plant, and she reported that the use of magnesium stearate had been "cut back" by 75%. However, her report was based upon an employee's representation that usage had been reduced by 90%, a figure which she, herself, considered an exaggeration.

On November 15, 1976 a memo was sent to O'Mahoney describing how the air-conditioning system in the plant was malfunctioning due to the presence of MS dust, but again no action was taken. There had been a similar air-conditioning malfunction in April of 1976. There was also testimony that the ventilation system in the Freshen-Up production area was neither adequate nor designed for the removal of airborne dust. In fact, the system, which employed recirculation, tended to increase the concentration of airborne dust.

On the defendants' case, various Warner-Lambert employees involved in fire protection and industrial hygiene testified that there was *no* danger of an explosion from MS dust at the plant and that their surveys made in November of 1975 and June of 1976, showed that the concentration of MS dust was many times smaller than the LEL. It was also stated that the insurer's report prepared after its February, 1976 inspection was inaccurate, and that no measurements of dust concentration had been made at that time. In addition, they stated that their research had revealed no reported case in which liquefaction had led to a detonation.

### ADDITIONAL EVIDENCE—THE POSTEXPLOSION INVESTIGATIONS

In addition to the foregoing, representatives of the New York City Fire Department, the United States Occupational Safety and Health Administration (OSHA), and other experts investigated the explosion and testified before the Grand Jury with respect to their observations and conclusions.

A New York City Fire Marshal who had arrived at the scene just minutes after the explosion described the explosive properites of MS dust, and stated, in effect, that the interreac-

tion of liquid nitrogen and the oxygen in the air created a greater risk of an explosion. He determined that the source of the primary explosion was the "D" machine, and opined that such an explosion would have propelled additional magnesium stearate into the atmosphere, thus causing a second explosion of ambient MS dust. He observed that there was no exhaust system in the Freshen-Up department and concluded that the presence of such a large quantity of MS dust without such a system created a substantial risk of an explosion. He further concluded that despite the presence of a source of ignition, there would have been no explosion but for the quantity of MS present.

An OSHA investigator confirmed the fire marshal's view that there had been a smaller, primary explosion at the "D" machine which propelled additional MS dust into the air and triggered a second, more massive explosion.

Another OSHA investigator learned that the uniplast machines had experienced "freeze-up" problems in the past and that airhoses were being employed for purposes of "de-icing". He also observed that the "die" portion of the "D" machine (that portion which "punched out" the individual pieces of gum) was still heavily iced, although none of the other uniplast machines were similarly afflicted.

A metallurgical engineer for the plant's insurer examined and tested pieces of the machinery after the explosion, and determined that all of them had been exposed to extreme cold, thus causing them to become brittle and fracture. The parts, he noted, were made of low-carbon steel, although a high alloy steel is necessary for resistence to extreme cold.[3]

The Grand Jury also heard testimony from a chemical engineer (a qualified expert who had investigated many of the nation's worst explosion disasters during the past 40 years) who opined that the explosion had occurred as follows: Liquid oxygen had formed and mixed with the settled MS. In addition, the interior of the "D" machine had become brittle from the cold. When some form of ignition was supplied an explosion occurred at the "D" machine, which immediately resulted in a second, more massive explosion. This view was confirmed by another expert witness attached to the United States Mining Enforcement and Safety Administration, who added

3. Note that prior testimony had indicated that the uniplast machines were never designed to operate in the extreme cold.

that the type of electric motor used in the uniplast machines, when operating under normal conditions, would produce sparks of sufficient intensity to ignite magnesium stearate dust.

A chemical engineer who worked as a private consultant investigating chemical plant accidents testified that, in his opinion, there had *not* been a sufficient concentration of ambient MS dust to cause the initial explosion. He stated, however, that liquid oxygen (the product of liquefaction), when combined with MS, would form a compound highly sensitive to a spark or an impact of any kind and that, in his view, the explosion had occurred when an initial detonation at the "D" machine had dispersed approximately 50 pounds of MS dust which had accumulated near the base of that machine, which in turn exploded. He also testified that ambient dust and dust on the surrounding surfaces were *not* involved in the explosion, and that if the *second* explosion had resulted from dust which had been "jarred loose" from the overhead fixtures, etc., there would have been a gap of several minutes *between* the explosions, as it would have taken that long for the dust to become concentrated in the air in sufficient quantities to explode. He further stated that before ambient MS dust could become explosive, it would have to be so concentrated that employees would not be able to "see [their] hands in front of [their] face[s]" and concluded that a dust collection system would not have prevented the explosion and that improper wiring in no way contributed to its occurrence.

Another witness, called in by the corporate defendant's counsel to investigate the explosion, confirmed the prior witnesses' view with respect to the time gap between explosions and concluded that ambient dust could not possibly have been sufficiently concentrated to create the risk of an explosion. He characterized as "negligible" the contribution of ambient MS dust to the disaster. From his investigation, the witness concluded that this particular explosion was so unusual that neither the corporate defendant nor its managerial and technical personnel could have anticipated its occurrence.

A New York City Deputy Chief Fire Marshal concluded from his investigation that the concentration of MS dust *was* high enough to create a substantial risk of explosion and that the use of airhoses by the corporate defendant increased that risk. He believed that the installation of a dust collection system would have prevented the explosion, and concluded

from his examination of the "D" machine that a particular gear mechanism therein had "snapped" prior to the initial detonation. This snapping, he opined, could have resulted in a mechanical spark. The fire marshal disagreed with the other testimony that there would have been a "time lag" between explosions and that visibility in the plant would have had to be minimal before the dust would become explosive. The physical damage at the site indicated to him that there had been a dust explosion along the ceiling in that area, which he attributed to the fact that there had been an initial detonation, followed almost instantaneously by a second explosion which "mushroomed" upwards. This conclusion was based on the following factors: (1) the ceiling and contiguous duct work were destroyed and scorched, while fixtures hanging down from the ceiling were not disturbed; (2) cinder block walls and windows were pushed out near their tops but not at their bottoms; and (3) the areas around the uniplast machines were hardly disturbed, while there was heavy damage to the areas above them. Thus, dust suspended near the ceiling or propelled there *must* have exploded before it could have settled at a lower level.

On the basis of this evidence, the Grand Jury returned the indictment which is the subject of this appeal.

### THE LEGAL STANDARD

Section 125.10 of the Penal Law ("Criminally negligent homicide") provides that "[a] person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person." Section 125.15 of the Penal Law ("Manslaughter in the second degree") provides, *inter alia,* that "[a] person is guilty of manslaughter in the second degree when: 1. He recklessly causes the death of another person".

"Recklessly" and "criminal negligence" are defined in section 15.05 of the Penal Law as follows:

"3. 'Recklessly.' A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

"4. 'Criminal negligence.' A person acts with criminal negligence with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

Thus, both culpable mental states require the existence of (1) a "substantial and unjustifiable risk" that a result or a circumstance proscribed by the statute (here, death) will occur or exists, and (2) "a gross deviation" from a reasonable person's standard of care. The distinction is that the "reckless" actor is aware of such risk and consciously disregards it, while the "criminally negligent" actor, who is *not* aware of such risk, culpably fails to perceive it (see *People v Montanez,* 41 NY2d 53, 56).

In *People Leichtweis* (59 AD2d 383, 387), this court held that "on a motion to * * * dismiss an indictment, the court may dismiss only if there is insufficient evidence to sustain the crime charged or any lesser included offense". Since the evidence in this case reveals that the crime of criminally negligent homicide would also be a lesser included offense to the counts charging manslaughter in the second degree (see *People v Stanfield,* 36 NY2d 467; see, also, *People v Perez,* 45 NY2d 204), it follows *ex necessitate* that the *entire* indictment will have to be reinstated if "sufficient evidence" of even the lesser charge exists. As for the test to be employed in evaluating the sufficiency of the evidence before the Grand Jury, it is well established that an indictment will be sustained if based upon prima facie proof that the crime charged has been committed *(People v Haney,* 30 NY2d 328, 335-336; *People v Peetz,* 7 NY2d 147) and that a motion to dismiss will *not* be granted in the absence of a "clear showing" that the evidence adduced, if unexplained and uncontradicted, would not warrant a conviction by a trial jury *(People v Dunleavy,* 41 AD2d 717, affd 33 NY2d 573).

In our opinion, there has been no such "clear showing" that the evidence here is insufficient. To the contrary, it is our belief that the evidence before the Grand Jury was sufficient to establish prima facie that the defendants, at a minimum, failed to perceive a substantial and unjustifiable risk of a

deadly explosion, and that such failure constituted a gross deviation from a reasonable person's standard of care.

From the inception of Freshen-Up production in 1974, there were growing indications of problems with MS dust which the defendants, collectively and individually, failed to address. Although the use of magnesium stearate and liquid nitrogen might not per se have generated a "substantial and unjustifiable" risk of an explosion, their conscious employment in conjunction with machinery which was neither designed nor appropriately modified for their use (or for use in the production of gum) evinces a gross lack of perception. A hazardous condition regarding the ambient MS dust was perceived by a third party (Warner-Lambert's insurer) as early as February, 1976, and the level of that perceptible risk was only increased, rather than diminished, by the use of airhoses and a ventilation system which recirculated the air, thus raising the level of ambient MS dust. In May and June of 1976, there were specific and emphatic warnings that the level of dust was sufficient to result in an explosion, and yet in June and July separate proposals for a dust collection system and an exhaust system to eliminate ambient MS dust were both rejected. Moreover, despite the August, 1976 cleanup, there was evidence that the situation deteriorated dramatically within the next few weeks and that the concentration of MS dust was often as thick as a fog in the period preceding the November 21 explosion. It further appears that on the day immediately preceding the explosion, the "D" machine, which was established to be the site of the detonation, was seen to be smoking and/or burning.

Additional objective evidence tended to show that the "D" machine had been operating at a temperature well below its intended operating range and perceptibly colder than the other uniplast machines, and that the foregoing rendered the advent of liquefaction all the more probable. The evidence that liquefaction could not, or should not have resulted in detonation is negated by the fact that it was occurring in a piece of machinery which was ill-suited and never designed for operation at such cold temperatures and whose parts, it was testified, might become brittle and fracture as a result. Such breakage was stated to be sufficient to detonate the liquid oxygen or to produce a mechanical spark which could do so. In addition, there was other evidence that the non-dust-proofed motor and related wiring could also have supplied a sufficient

spark. Finally, while it could conceivably be argued that the occurrence of liquefaction was itself unforeseeable, the fact remains that there was ample evidence before the Grand Jury from which it could conclude that the explosion per se would not have occurred had an adequate program of MS management been installed at the plant and, at the minimum, that the apparent failure of each of the defendants to perceive and/or initiate (to the greatest extent possible within his particular sphere of authority) an adequate response to the grave risk of death presented by the absence of such a program constituted "a gross deviation from the standard of care that a reasonable person would observe in the situation."

We therefore conclude that when all of the evidence before the Grand Jury is examined together, there is sufficient evidence to make out a prima facie case against each of the defendants for criminally negligent homicide. Thus, all of the counts of the indictment should be reinstated. We hasten to add, however, that the foregoing is predicated on the underlying assumption that questions of credibility and the weight to be accorded the evidence were resolved most favorably to the People (see *People v Leichtweis,* 59 AD2d 383, 389, *supra),* and that a contrary conclusion could be drawn by the trial jury. As the Court of Appeals noted in *People v Haney* (30 NY2d 328, 336, n 10, *supra):* "[I]t must be observed that it is the Grand Jury which is the arbiter of the credibility and the weight to be given to the evidence [before it]. As we wrote in *People v. Eckert* (2 N Y 2d 126, 129): 'That a trial jury might not convict on this evidence is not our concern. The Legislature has specifically relegated the question of whether a trial jury would return a conviction on this evidence to the *judgment* of the Grand Jury'."

Accordingly, the order dated July 26, 1978 and entered upon reargument should be reversed insofar as appealed from on the law, and the indictment reinstated as to each of the defendants.

The appeal from the order dated February 15, 1978 should be dismissed, as that order was superseded by the order entered upon reargument.

SUOZZI, J. P. (concurring in part and dissenting in part). I agree that the appeal from the order dated February 15, 1978 should be dismissed. However, I would uphold the dismisal of the indictment on the basis of the well-reasoned opinion of

Mr. Justice LEAHY at Criminal Term, with the following additional comments.

The instant indictment, which charged the corporate defendant and several of its officers and employees with the crimes of manslaughter in the second degree and criminally negligent homicide, arose out of an explosion which occurred on November 21, 1976 on the fourth floor of the corporate defendant's Long Island City plant where gum was being manufactured. As a result of that explosion, six employees of the corporate defendant died and numerous others were injured.

The crux of the counts in the indictment charging second degree manslaughter was that defendants recklessly caused death by applying magnesium stearate (MS) powder to the gum manufacturing process "in such quantities and in such manner which caused the magnesium powder to accumulate * * * as well as being suspended in air, which, in turn, caused a condition that was intrinsically and inherently dangerous to * * * life and safety * * * and was * * * of such nature and character * * * to constitute a serious explosion hazard * * * creating a substantial and unjustifiable risk of death" and by consciously disregarding the substantial and unjustifiable risk of death of which they had notice "which also constituted a gross deviation from the standard of conduct that a reasonable person would have observed under the circumstances."

The crux of the counts charging criminally negligent homicide was that defendants "failed to perceive the substantial and unjustifiable risk of death" caused by the afore-noted use of the magnesium stearate powder.

The theory of the cause of the fatal explosion as reflected in the indictment was in accord with expert testimony and scientific evidence adduced before the Grand Jury which indicated that when MS is dispersed into the air at or above a minimum density, often referred to as the lower explosion level (LEL), a serious risk of explosion exists upon ignition.

On the other hand, this same expert testimony and opinion also indicated that MS in bulk, inert or settled form, does not create a risk of explosion and, if ignited in this form, it will only burn or smolder.

It was the prosecution's argument at the Grand Jury and on this appeal that the defendants had consciously disregarded the risk of explosion by allowing ambient MS to accumulate in a concentration over the LEL and that this pre-existing ambient MS dust cloud was ignited, causing the explosion.

However, the evidence before the Grand Jury was equally consistent, if not more so, with a finding that the fatal explosion was not caused by a pre-existing concentration of MS over the LEL, but rather was caused by a totally unforeseen initial, smaller explosion which occurred a few minutes earlier at the base of one of the production machines.

Criminal Term, in its decision, stated that "the consensus of expert opinion given before the Grand Jury" was that this initial explosion was the result of a cryogenic phenomenon called "liquefaction". Liquefaction involves the concentration into volatile liquid form of the oxygen in the atmosphere which has come into contact with an extremely cold substance, which in this case was the otherwise harmless liquid nitrogen ($LN_2$) used by the corporate defendant as a cooling agent in its manufacturing process. This theory of the initial explosion was best expressed by a representative of the Bureau of Mines of the Mining Enforcement and Safety Administration, who was asked by OSHA to investigate the accident and who testified that: "it was most likely that the initial explosive-type reaction came from an oxygen enriched liquid air reaction with the magnesium stearate."

In his report to OSHA, this expert stated that: "The dust explosion was preceded by an initial explosive-type reaction. The most likely initial explosive reaction was oxygen—enriched liquid air and *undispersed* magnesium stearate * * *. The initial explosive-type reaction blew apart * * * Machine D, dispersed the magnesium stearate dust and either directly ignited the dispersed dust or caused an electrical arc which ignited the dust" (emphasis supplied).

Implicit in this theory advanced by the experts was the proposition that the initial explosion caused the settled and harmless MS dust to become dispersed into the atmosphere in a heavy enough concentration to produce the second explosion which was an MS dust explosion.

However, in contrast to the substantial risk of an explosion in the presence of a pre-existing concentration of ambient MS dust over the LEL, the experts testified that the risk of an explosion of inert MS dust in the presence of liquid oxygen created by liquefaction (and the subsequent dispersal of MS into the atmosphere) was totally unforeseen. These same witnesses emphasized that liquid nitrogen is one of the most widely used cryogenic materials due to the fact, as Criminal Term acknowledged, that liquid nitrogen is "non-toxic, non-

combustible and vaporizes quickly and without dangerous effects when exposed to room temperatures; furthermore, because of its inherent stability, it is often used in fire extinguishers." A cryogenic expert, with the United States Department of Commerce, called upon by OSHA to investigate the accident, reported that "[s]everal hundred million dollars of liquid nitrogen are used annually without incident." In discussing the relatively unfamiliar field of cryogenics another expert testified: "there is absolutely no way that the people at the company, including technical and managerial, could've anticipated this event. It's completely unforeseen."

Criminal Term also correctly noted that neither the corporate defendant's insurer, its suppliers of both $LN_2$ and its machines, nor any governmental agency, all of whom were familiar with the operations of the plant, ever warned the defendants of any risk associated with the use of liquid nitrogen, and settled or inert MS dust.

Under these circumstances, the indictment as against all of the defendants should be dismissed.

LAZER, GULOTTA and SHAPIRO, JJ., concur in *Per Curiam* opinion; SUOZZI, J. P., concurs as to the dismissal of the appeal from the order dated February 15, 1978, but otherwise dissents and votes to affirm the order dated July 26, 1978 insofar as appealed from, with an opinion, in which O'CONNOR, J., concurs.

Order of the Supreme Court, Queens County, dated July 26, 1978, reversed insofar as appealed from, on the law, and, upon reargument, indictment reinstated.

Appeal from an order of the same court, dated February 15, 1978, dismissed as academic. That order was superseded by the order dated July 25, 1978, made upon reargument.